## NEW ENGLAND LEGAL FOUNDATION
## et al.
## v.
## Douglas M. COSTLE et al.
## Civ. No. H–78–414.

United States District Court,
D. Connecticut.

July 30, 1979.

Wayne S. Henderson, Harrison A. Fitch, Boston, Mass., for plaintiffs.

Edward J. Walsh, Jr., Mineola, N. Y., Donald W. Stever, Jr., and Lydia N. Wegman, Dept. of Justice, Washington, D. C., Paul S. Shemin, Asst. Atty. Gen., New York City, Steven A. Tasher and Richard M. Hluchan, Deputy Attys. Gen., Trenton, N. J., for defendants.

## MEMORANDUM OF DECISION

NEWMAN, Circuit Judge.[*]

The plaintiffs in this action seek a declaratory judgment and injunctive relief based upon alleged violations of the Federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*, of federal common law, and of various constitutional provisions. Plaintiffs include three non-profit organizations representing the interests of the citizens, businesses, and industries of Connecticut, thirty-one municipalities of Connecticut, and individual citizens and residents of Connecticut, who are concerned with the harmful effects felt in Connecticut from air pollution allegedly generated from New York and New Jersey. Defendants Costle and Beck are, respectively, the Administrator and Region II Administrator of the Environmental Protection Agency ("EPA"), and defendant Long Island Lighting Company ("LILCO") is a New York Corporation.[1]

This matter is before the Court on defendants' motions to dismiss and for summary judgment, and on plaintiffs' motion for summary judgment. As the complaint raises different issues with respect to the federal and corporate defendants, EPA's motions will be considered separately from LILCO's.

---

[*] Of the United States Court of Appeals for the Second Circuit, sitting by designation. At the time these motions were submitted for decision, Judge Newman was a District Judge of the United States District Court for the District of Connecticut.

1. The complaint originally named Hugh L. Carey, Governor of the State of New York, Brendan T. Byrne, Governor of the State of New Jersey, Peter A. Berle, Environmental Conservation Commissioner of New York, and Rocco D. Ricci (succeeded by Daniel J. O'Hern), Environmental Protection Commissioner of New Jersey, as defendants in this action. Plaintiffs filed a notice of voluntary dismissal without prejudice as to these defendants pursuant to Fed.R.Civ.P. 41(a)(1)(i), and this Court ordered dismissal on December 14, 1978. Subsequently, the State of New York moved to intervene as of right, which motion was granted on January 1, 1979.

*Background of the Suit*

To prevent and control air pollution, Congress passed the 1970 Amendments to the Clean Air Act ("the Act"). The Amendments foster cooperative effort between the federal government and the states to achieve air quality standards set by EPA. EPA's Administrator is required to promulgate national air quality standards for various pollutants to protect public health and welfare from the adverse effects of pollutants for which air quality criteria are available. 42 U.S.C. § 7409.[2] Each state must then develop a state implementation plan ("SIP"). The SIP establishes emission limitations and pollution abatement measures to ensure the attainment of air quality standards within the areas of the state that are designated by EPA as part of interstate or major intrastate air quality control regions ("control regions"). §§ 7404, 7410.

After a state adopts or revises a SIP, the plan must be approved by EPA. § 7410(a)(2). If the plan meets certain requirements, the Administrator is obligated to approve it. § 7410(a)(3). However, if the SIP is found deficient in whole or in part, and the state fails within 60 days of notification to revise the plan satisfactorily, the Administrator must promulgate and implement a plan correcting the deficiencies. § 7410(c).

Recognizing that many control regions had failed to meet national air standards because of inadequate state regulation and enforcement, and because of noncompliance by sources of pollution, H.R.Rep.No.95–294, 95th Cong., 1st Sess. 207–11 (1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1077, 1286–90, Congress significantly amended the Act in 1977. The 1977 Amendments require each state to identify those areas that either do not meet national standards as of August 7, 1977, or may not meet the standards for sulfur dioxide or particulates by the applicable SIP deadline, or cannot be classified on the basis of available information for sulfur dioxide or particulate quality levels. § 7407(d). An area not meeting one or more national standards is to be designated as "nonattainment" for each pollutant as to which the pertinent standard is violated. § 7501(3).

After the designations are approved or modified by the Administrator, § 7407(d)(2) and (5),[3] a state must revise its SIP before permitting the construction or modification after July 1, 1979, of any facility that will contribute to concentrations of any pollutant for which the area is "nonattainment." §§ 7410(a)(2)(I), 7501–7508. The revised plan must provide for attainment of national air quality standards no later than December 31, 1982, except that the deadline with respect to severe oxidant and carbon monoxide problems may be extended to as late as December 31, 1987. § 7502(a)(2). The revisions must implement all reasonably available control measures as expeditiously as practicable, require reasonable further progress toward attainment in the interim, including reductions through the use of reasonably available control technology, provide an inventory of actual emissions from all sources to assure that progress is made, and require permits for construction and operation of new or modified major pollution sources. § 7502(b).

Moreover, § 7410(a)(2)(E), as amended in 1977, requires SIP revisions that will prohibit any stationary source from interfering with another state's measures to attain national air quality standards, to prevent significant deterioration of existing air quali-

---

**2.** References to provisions of the Clean Air Act will henceforth be made only to the appropriate section number of Title 42 of the United States Code.

**3.** On March 3, 1978, the Administrator promulgated air quality designations for all areas of the country. 43 Fed.Reg. 8962 (1978). Of relevance to this case are the designations for areas in New York and New Jersey that may affect the air quality in Connecticut. The entire states of New York, New Jersey, and Connecticut were designated "nonattainment" for the national standards for photochemical oxidants. New York City was designated "unclassifiable" for sulfur oxide and particulate primary and secondary standards. Staten Island was designated "nonattainment" for secondary particulate standards, and Northern and Southern New Jersey were designated "nonattainment" for particulates.

ty, and to protect visibility. Where there is an interstate control region, such as the New York-New Jersey-Connecticut region, EPA requires all of the states to revise their SIPs to account for the worst case of nonattainment among them for any national standard. Affidavit of William Baker, Chief of EPA Region II Air Programs Branch, Defendant's Appendix 4 to Motion to Dismiss and for Summary Judgment. In this case, New York and New Jersey are required to tailor their SIP revisions to take account of Connecticut's air quality for those pollutants for which Connecticut's control attainment is poorest.

All revisions for nonattainment areas must be submitted to EPA by January 1, 1979, and are to be in effect no later than July 1, 1979. P.L. 95–95, 95th Cong., 1st Sess., Title I, § 129(c), 91 Stat. 750.

*The Suit Against EPA*

The basic thrust of the plaintiffs' action against EPA is the agency's alleged failure to perform its statutory duties to revise the New York and New Jersey SIPs, in both their stationary source and transportation control aspects, in order to abate the transport of air pollutants from those states to Connecticut. Because EPA does not have a mandatory duty at this time to take any of the actions that the plaintiffs seek, the complaint fails to state valid claims against EPA.

The Clean Air Act, which provides the entire basis for this Court's jurisdiction over the subject matter of the complaint,[4] establishes federal court jurisdiction over EPA in two ways. Section 7607(b) of Title 42 gives to the appropriate court of appeals exclu-

sive jurisdiction to review EPA's regulations, orders, SIP approvals or disapprovals and revisions, and "any other final action of the Administrator . . . which is locally or regionally applicable" or which is not determined by the Administrator to have "nationwide scope or effect." The district courts are given jurisdiction under § 7604(a)(2) in a civil action against the Administrator only "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."

Plaintiffs bring their claims under § 7604(a)(2). Hence, to survive a motion to dismiss for failure to state a claim, the alleged actions by the Administrator must constitute a refusal to perform a non-discretionary duty imposed elsewhere in the Act, and must not be directly reviewable by the Court of Appeals for the Second Circuit under § 7607(b). See *Oljato Chapter of Navajo Tribe v. Train*, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975); *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1353 (9th Cir. 1978); *Environmental Defense Fund, Inc. v. Costle*, 448 F.Supp. 89 (D.D.C.1978). Each of the plaintiff's claims will be considered separately to determine its validity under these prerequisites.

1. *Revision of the New York and New Jersey SIPs*

Plaintiffs allege that, on June 30, 1976, the Region II Administrator issued "Notices of Required Revisions" to the New York and New Jersey SIPs.[5] The New York notice presented the Administrator's findings that the SIP was inadequate to attain standards for sulfur oxides in New York

---

**4.** Plaintiffs cite numerous other bases for this Court's subject matter jurisdiction, including 28 U.S.C. §§ 1331, 1332, 1337, 1343, and 1361, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Only §§ 1331, 1332, 1337, and 1361 of Title 28 are arguably available. Section 1361 provides no jurisdiction not otherwise available under § 7604 of Title 42, *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1356 (9th Cir. 1978); the other alleged bases fail for lack of a waiver of sovereign immunity in the absence of any substantial claim of action of federal officers that is

beyond their statutory authority or unconstitutional. *See Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

**5.** These notices, published in the Federal Register on July 12, 1976, 41 Fed.Reg. 28618, and July 13, 1976, 41 Fed.Reg. 28842, were two of 221 such notices issued by EPA at that time. A notice was published for every air quality control region in which a national ambient air quality standard was not currently being met. For the relevant history, *see* S.Rep.No.95–127, 95th Cong., 1st Sess. 55 (May 10, 1977).

City, for particulate matter in New York City and portions of the Hudson Valley Region, and for photochemical oxidants throughout the New York portion of the New Jersey-New York-Connecticut Interstate Air Quality Control Region. The New Jersey notice presented the Administrator's findings that the SIP was inadequate to attain standards for photochemical oxidants and particulates in the New Jersey portion of the same control region.[6]

Plaintiffs further assert that the notices required the states to submit plan revisions by July 1, 1977, to include all readily available control measures, and by July 1, 1978, to include those necessary measures not readily available. The revisions were also to demonstrate that the proposed strategies would be adequate to attain the national air quality standards "as expeditiously as practicable." 41 Fed.Reg. 28625 (1976). If the Governors failed to send a letter of intent to comply with the notices, the EPA was to presume that the states would not prepare revisions, in which case the "EPA will begin to develop for promulgation a Federal plan to attain and maintain national standards." *Id.* at 28626.

Both New York and New Jersey have allegedly failed to revise their SIPs in accordance with the Notices of Required Revisions. Their plans, therefore, remain inadequate to attain the national standards for particulate matter, sulfur oxides, and photochemical oxidants, in violation of § 7410(a). Moreover, EPA has allegedly failed to correct the acknowledged SIP deficiencies by federal regulation as is its nondiscretionary duty under § 7410(c).

In complaining of EPA's inaction, the plaintiffs have incorrectly assessed the effect of the control strategies for particulates, sulfur oxides, and photochemical oxidants imposed by the 1977 Amendments. These specific procedural and substantive requirements, discussed above, effectively supersede the 1976 Notices of Required Revisions.

The legislative history of the 1977 Amendments indicates that EPA's attempts to enforce SIP revisions following the original 1975 compliance deadline were considered to be inadequate and required additional statutory guidance. See H.R.Rep.No. 95–294, 95th Cong., 1st Sess. 207–11 (May 12, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1286–90; S.Rep. No.95–127, 95th Cong., 1st Sess. 55 (May 10, 1977). The Senate Environment and Public Works Committee understood that the provisions for mandatory SIP revision for nonattainment areas in its proposed amendments to the House bill under consideration would moot the 1976 Notices:

> When a region exceeds a national air quality standard after the deadline for attainment, a question arises as to what new sources of that pollutant, if any, are permitted, by law, in the region . . . . Believing that a statutory clarification of the question is needed, the Committee has developed a comprehensive scheme which extends some deadlines for attainment of national air quality standards, set out requirements for approval of implementation plan revisions, and imposes stringent requirements as conditions for growth in areas not meeting national standards. These provisions supercede [sic] the EPA administrative approach.

S.Rep.No.95–127, *supra* at 55.

Choosing to preserve the primary role of the states in attaining national standards, the Conference Committee adopted the Senate's approach for mandatory SIP revisions as a precondition for permitting major new stationary sources to locate in a nonattainment area. §§ 7501–08, 7410(a)(2)(I). With no indication to the contrary, it is reasonable to conclude that the 1977 Amendments' design for nonattainment plan revisions and deadline extensions operates in the same way as the Senate

---

6. For purposes of this opinion, various air quality designations or deadlines under the Clean Air Act for "New York" or "New Jersey" pertain, except where otherwise described, to the New York portion or the New Jersey portion, respectively, of the New York-New Jersey-Connecticut Interstate Air Quality Control Region. Appendix A to the Complaint enumerates the counties included in both portions.

Committee's proposal, on which it is based, to nullify the effect of the outstanding Notices of Required Revision.[7]

The facts in the present case illustrate the logic of so construing the Amendments. Of the nonattainment areas for oxidants and particulates for which revisions were required under the 1976 Notices, all but three[8] were designated nonattainment for the same pollutants by EPA on March 3, 1978, under the amended § 7407(d) procedure. Compare 41 Fed.Reg. 28618, 28842 (1976) with 43 Fed.Reg. 8962 (1978). This means that the revisions called for in 1976 relate to the same nonattainment problems that New York and New Jersey would have to confront in submitting 1979 SIP revisions under Part D of the amended Act, §§ 7501–7508. Both New York and New Jersey have submitted proposed SIP revisions pursuant to Part D.[9] These revisions will be assessed by EPA as to whether they will attain national standards in the nonattainment areas designated on March 3, 1978, and as to whether they will prevent stationary sources in nonattainment areas from

7. Unlike the Senate amendments, the House bill permitted the states to choose between compliance with EPA's Emission Offset Interpretative Ruling, 41 Fed.Reg. 52224 (Dec. 21, 1976) (the "offset" policy established that if a national standard for any pollutant was exceeded in a control region after the attainment date, no further construction or expansion of sources of that pollutant could be permitted in that region), and SIP revision to ensure attainment of the national standards by the deadlines set in the 1977 Amendments. H.R.6161, 95th Cong., 1st Sess. § 117 (1977). Consistent with this elective approach, the House Committee Report explained that the states would remain obligated to revise their SIPs according to the 1976 Notices, and EPA to promulgate needed revisions if the states failed to amend in a timely fashion, but that the states could also revise their SIPs further to qualify for an exemption from the emission offset ruling. H.R. Rep.No.95–294, 95th Cong., 1st Sess., reprinted in [1977] U.S.Code Cong. & Admin. News, p. 1293. EPA argues that, since the flexible House approach was rejected in favor of the Senate's provision for mandatory SIP revision before the construction or alteration of major pollutant sources, the Senate's intent to override the 1976 notices accurately reflects Congressional policy.

The Supreme Court has counseled courts to show deference to the interpretation given a statute by the agency administering it, particularly "when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. International Union of Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), *quoting Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

EPA's understanding of the legislative history is persuasive in light of the fact that the House Report's reference to the continued enforceability of the 1976 notices was made with respect to a section of the House bill that would have prohibited EPA from promulgating any SIP revision offering an exemption from the "offset" rule. *See* H.R.6161, 95th Cong., 1st Sess. § 117(f), H.R.Rep.No.65–294, *supra* at 214, *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 1293. This provision was deleted from the final version of the Act, however, in the creation of provisions for SIP revisions that "adopt[ed] much of the Senate's approach to the nonattainment problem." Clarifying Statement of the Conference Committee on P.L. 95–95, 123 Cong.Rec. H 8662 (Aug. 4, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin. News, p. 1573. Moreover, the Agency's interpretation of the superseding effect of the 1977 Amendments is decisive given the EPA's *bona fide* reliance on the Congressional intent underlying §§ 7501–7508 and the potential for wasteful duplication of effort if EPA were to act now as plaintiffs request, *see* discussion *infra*.

Plaintiffs erroneously rely on Pub.L. 95–95, 95th Cong., 1st Sess., § 406(b), 91 Stat. 795, to support their argument that the 1976 revision requirements remain in effect. While providing that all actions taken pursuant to the Act prior to the amendments remain in effect until modified or rescinded, that section must be read as applying only to those portions of the SIPs that are not clearly superseded by the statute itself.

8. The 1976 Notices listed New York City as a nonattainment area for particulate and sulfur oxides, and the Hudson Valley region as nonattainment for particulates. EPA redesignated these areas on March 3, 1978, as either in attainment or unclassifiable for these pollutants. Such designations supersede the EPA's earlier determinations for purposes of nonattainment plan revisions in §§ 7501–7508. *See* § 7407(d).

9. New York State submitted its revised Air Quality Implementation Plan on February 23, 1979, and New Jersey submitted its revised SIP on December 29, 1978.

causing or contributing to violations of the national standards in Connecticut.

It would make no sense as a practical matter for EPA to promulgate SIP revisions premised on the now-superseded 1976 notices, only to have them eclipsed by the 1979 revisions. Moreover, EPA action at this time would frustrate the obvious statutory purpose in delaying the deadline for submission of Part D revisions until January 1, 1979: to allow integrated state and local consideration of the most appropriate mix of stationary source and transportation controls to meet national air quality standards. See § 7401(a)(3) (pollution control is the "primary responsibility of States and local governments").

The submission of New York's and New Jersey's 1979 revisions has initiated the administrative review process established by the statute. EPA will have to approve or disapprove the states' submissions, and, if the proposed revisions are found inadequate to prohibit stationary sources in these states from affecting Connecticut's attainment of air quality standards, the states will have 60 days or a period prescribed by the Administrator to revise further the SIPs. After that time, if the states fail to act, EPA must publish regulations setting forth the necessary SIP revisions. § 7410(c). If plaintiffs were to consider the promulgated revisions still inadequate, they will have an opportunity to petition for review in the court of appeals for the appropriate circuit. § 7607(b).

■ Until EPA's review of the newly submitted SIPs is completed, neither EPA nor the plaintiffs can determine a need for additional control measures to prevent interstate pollution. The Administrator will grant approval only when the SIP, as revised, meets all the requirements of §§ 7410(a)(2) and 7502(b), and "[d]etermining whether such is the case requires the fusion of technical knowledge and skills with judgment which is the hallmark of

duties which are discretionary." *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978). Once EPA has performed its review duties, and if the states then have failed to make any required further revisions of their SIPs, the Administrator may well have a mandatory duty to act in the manner prescribed by § 7410(c)(1)(C), *Natural Resources Defense Council v. Train*, 545 F.2d 320 (2d Cir. 1976), but the Agency has no statutory obligation at this time to conform the SIPs to the requirements of the 1976 notices.

### 2. Promulgation of a Transportation Control Plan for the New York Metropolitan Area

In paragraph 80(b) of Count IV and the related paragraphs of Counts I and II, the plaintiffs charge EPA with violation of its non-discretionary duty to promulgate federal regulations establishing public transportation control measures for New York City that would meet the standards for carbon monoxide, hydrocarbons, and photochemical oxidants as expeditiously as practical. In addition, plaintiffs allege that EPA has failed in its mandatory duty to prepare and implement transportation control revisions that provide for emission reductions in the New York City area equivalent to the reductions expected to be achieved by the imposition of tolls on bridges over the East and Harlem Rivers.

The history of New York State's efforts to comply with the Act's requirements for transportation control has been the subject of ongoing civil litigation in the Second Circuit since 1973.[10] For present purposes, it is sufficient to note that New York submitted a plan called the Transportation Control Plan for the Metropolitan New York City Area ("TCP") containing 32 mandatory "strategies" or schedules of specific actions to be taken by certain dates in order to abate automotive air pollution. Allegedly, the Administrator approved New York's

---

10. *See Friends of the Earth v. EPA*, 499 F.2d 1118 (2d Cir. 1974); *Friends of the Earth v. Carey*, 535 F.2d 165 (2d Cir. 1976); *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.), *cert.* denied, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). These opinions document in detail the development of the New York transportation control plan.

plan on June 22, 1973, "with certain exceptions, including the requirement that the Governor of New York submit by July 30, 1973, the legislative authority needed to carry out the transportation control strategies contained in its Plan, and by December 30, 1973 the necessary adopted regulations and administrative policies needed to implement the strategies." Complaint ¶ 57. It is not disputed that New York never submitted these measures. Plaintiffs assert, therefore, that New York failed to submit a TCP adequate to meet the requirements of § 7410(a).

On January 8, 1975, EPA issued Notices of Violation to the State of New York, pursuant to § 7413(a)(1), with respect to 12 of the 32 strategies contained in the TCP. The EPA has neither initiated judicial enforcement proceedings, nor promulgated federal regulations establishing a TCP for New York. Plaintiffs allege that EPA has breached its non-discretionary duty to prepare and implement a federal alternative to the ineffective New York TCP that would attain applicable national standards.

The 1973 TCP had proposed the imposition of tolls on the East River and Harlem River bridges, which would reduce unnecessary travel by vehicles attempting to avoid existing tolled facilities. The 1977 Amendments, however, allowed for elimination of any such strategy upon application by the Governor of a state. § 7410(c)(5)(A). On October 19, 1977, the Governor of New York applied to the Administrator to remove the toll strategy. On December 5, 1977, the application was granted. 42 Fed. Reg. 61453 (1977).

Application by the Governor was accompanied by his certification that the New York SIP would be revised by August 7, 1978, to provide for emission reductions equivalent to the reductions that were reasonably expected to be achieved through the use of the bridge tolls. See § 7410(c)(5)(B). The Governor submitted this revision on August 6, 1978, but EPA determined that it was inadequate to satisfy the statutory requirements. 44 Fed.Reg. 5693–95 (1979). Plaintiff alleges that, in-

stead of promptly preparing and implementing a substitute plan for the toll strategy, the Administrator requested New York to submit a corrected revision as part of its 1979 SIP package.

■ Although New York's original TCP may have been inadequate for lack of the legislative authority necessary to implement it, and although New York may still be in violation of §§ 7410(a)(2)(B) and (c)(5)(B) with respect to many of the TCP strategies, the Act neither mandates enforcement of the outstanding Notices of Violation nor requires the Administrator at this time to propose federal revisions under § 7410(c) redressing such deficiencies.

■ Clearly, the Administrator is not obligated to initiate legal action to enforce SIP provisions. Section 7413(a)(1) states:

Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or *he may bring a civil action* in accordance with subsection (b) of this section. (Emphasis added).

■ The Act, therefore, imposes upon the Administrator a non-discretionary duty to issue a Notice of Violation once he finds non-compliance with SIP requirements, and the Administrator has been held to make such a finding when information regarding an alleged violation is presented to him. See *Wisconsin's Environmental Decade, Inc. v. Wisconsin Power & Light Co.*, 395 F.Supp. 313 (W.D.Wis.1975). The plaintiffs have acknowledged that the Administrator fulfilled his responsibilities on this score. But once a Notice of Violation has been issued, the decision to proceed further is discretionary with EPA, and is not subject to review. *Kentucky ex rel. Hancock v.*

*Ruckelshaus,* 497 F.2d 1172, 1177 (6th Cir. 1974). Accordingly, the plaintiffs cannot state a cognizable claim under § 7604(a)(2) to compel EPA enforcement under § 7413.

Moreover, for the reasons previously discussed with respect to revision of New York's SIP, the Administrator does not now have a non-discretionary duty to implement a federal substitute for New York's TCP. The 1977 Amendments permit attainment deadline extensions for control regions currently in nonattainment for particulates until the end of 1982, and for photochemical oxidants until the end of 1987. EPA's March 3, 1978, notice listed New York as nonattainment or unclassifiable under the national standards for both. Plaintiffs recognize that submicron particulates are largely a product of automotive fuel combustion, Complaint ¶ 37, and that photochemical oxidants consist in substantial part of hydrocarbons emitted by automobiles, Complaint ¶ 28. According to the New York SIP, motor vehicles are responsible for approximately 65% of the state's hydrocarbon emissions and 50% of the photochemical oxidants, Complaint ¶ 32. Obviously, New York's 1979 SIP revisions, submitted pursuant to § 7502, will have to include transportation control measures necessary to insure attainment of the particulate and oxidant standards. §§ 7410(a)(2)(B) and (G).

This Court's holding that the 1977 Amendments have suspended any prior statutory duty of the EPA to promulgate an alternative SIP for New York applies equally to its transportation control measures. At least until the 1979 revisions are complete and the Administrator determines whether the plan is still inadequate, federal promulgation of a redesigned TCP is not statutorily required. Furthermore, EPA action at this time may prove unproductive. In drafting and revising the 1979 SIP transportation provisions, New York may elect to eliminate or alter its former strategies. A federal TCP substitute might implement measures inconsistent with or abandoned by the state's revised and approved nonattainment plan provisions.[11]

Plaintiffs argue, however, that elimination of the bridge toll strategy activated a deadline of August 7, 1978, for New York's final revision of a TCP meeting the requirements of § 7410(c)(5)(B), after which the Administrator must prepare a SIP correcting any deficiencies in the revision. Plaintiffs' argument is premised on their erroneous assumption that the language of § 7410(c)(5)(B), requiring a state to submit a plan revision "not later than one year after the date of enactment," refers to completion of all TCP revisions and final approval of the SIP by EPA. This assumption overlooks the following subsection (c)(5)(C), which provides:

> Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

Clearly, this provision concerns the date on which a state must resubmit its TCP with suggested improvements if its first revision due on August 7, 1978, is found inadequate. New York was not required to submit specific Part D plan revisions until January 1, 1979. EPA's direction to submit a corrected revision of the TCP proposal presented on August 6, 1978, as a part of the January, 1979, SIP revision package, was totally consistent with the terms of subsection (c)(5)(C).

### 3. *EPA Review of the Approved Variance for LILCO's Electricity Generating Plants*

On August 26, 1977, EPA allegedly approved, by its authority under § 7410(a)(3)(A), a revision to the New York SIP that allowed a "special limitation" for the use of high sulfur fuel by LILCO at its electricity generating plants in Northport

---

11. For example, the 1977 Amendments remove parking management controls from the measures that the Administrator may include in a SIP promulgated by the EPA. § 7410(a)(5). Although EPA may not require New York's former TCP strategy B–1a (Enforcement of Traffic and Parking Regulations), the State may include that proposal or a variation of it in the revised transportation plan.

and Port Jefferson on the north shore of Long Island. The special limitation permits these facilities to use fuel oil having a maximum 2.8% sulfur content until May 31, 1980. The New York State regulation for sulfur content in fuel oil had provided a general limitation of 1% for plants in Suffolk County.

Plaintiffs allege that the use of 2.8% sulfur fuel by the LILCO plants increases the levels of sulfur dioxide, particulate matter, and sulfates in Connecticut, and thereby interferes with Connecticut's measures to prevent significant deterioration of its air quality and to attain national air quality standards for these pollutants in violation of § 7410(a)(2)(E). Plaintiffs claim that the Administrator has failed to perform his non-discretionary duty to revise the New York SIP so as to meet the requirements of § 7410(a)(2)(E). Therefore, this Court allegedly has jurisdiction to order EPA to revoke its conditional approval of LILCO's variance.

EPA responds that plaintiffs' claim for relief is, in essence, a petition for review of EPA's final action in approving the variance. The argument continues that such review, like review of any SIP revision, is available only in the courts of appeals, § 7607(b), and that the time for seeking review has now passed.

Although it is clear that EPA's initial approval of the LILCO variance is not reviewable by this Court under § 7604, EPA has misconstrued the substance of plaintiffs' complaint. Plaintiffs do not seek to resurrect a claim against EPA that is now barred by the statutory time limit on petitions for review. Rather, they allege that the 1977 Amendments have given rise to EPA's non-discretionary duty to reappraise the effect of the variance on interstate pollution.

The 1977 Amendments significantly altered SIP requirements with respect to the abatement of interstate air pollution. Section 7410(a)(2)(E) was added to require that each SIP prohibit any stationary source within the state from emitting pollutants that would interfere with measures taken by another state to attain or maintain national air quality standards or to prevent significant deterioration of its existing air quality. This basic prohibition is implemented by Title I, Part C of the Act, §§ 7470–7491, entitled "Prevention of Significant Deterioration of Air Quality" ("PSD"). According to § 7471, each SIP must contain emission limitations and other measures necessary, as determined by applicable agency regulations, to prevent significant deterioration of air quality in any region that has been designated "unclassifiable" for sulfur oxides or particulate matter, § 7407(d)(1)(D), or "in attainment" or "unclassifiable" for any other pollutant, § 7407(d)(1)(E). Section 7473 sets numerical increments defining the maximum amounts of sulfur oxides or particulates that any "unclassifiable" region may allow to be added to the existing levels over a certain time period. Stricter standards of protection are established for control regions containing national parks and wilderness areas, defined as Federal class I areas under § 7472(a), than for control regions without such areas. See §§ 7473(b)(1), 7491.

Since the 1977 Amendments and applicable legislative history do not establish a separate and unique date for submission of SIP revisions under these sections, the deadline for action by the states is set by § 406(d)(2) of P.L. 95–95, 91 Stat. 796. Section 406(d)(2) provides that each state that is required to revise its SIP by reason of any of the 1977 Amendments must adopt and submit the proposed changes before the later of one year from the date of enactment (i. e., August 7, 1978) or nine months after promulgation of EPA regulations necessary for the approval of such revisions.

In the March 3, 1978, publication of air quality statuses, the Administrator designated the boroughs of New York as either unclassifiable or in attainment for sulfur dioxide and particulates. 43 Fed.Reg. 9018 (1978). On June 19, 1978, the Administrator promulgated final PSD regulations. 43 Fed.Reg. 26380 (1978). Therefore, New York was required to submit its applicable

SIP revisions no later than nine months after promulgation of the PSD regulations, *i. e.,* by March 19, 1979.

■ Although failing to act in a timely fashion, New York apparently has submitted proposed revisions on or about June 12, 1979, to administer and enforce the PSD regulations. See Affidavit of William S. Baker (filed July 5, 1979). The Administrator has a non-discretionary duty to approve or disapprove these proposals within four months of the date required for submission. § 7410(a)(2). In assessing the sufficiency of the New York revisions, the Administrator must determine whether the PSD regulations and the general prohibition on significant interstate pollution are met. §§ 7410(a)(2)(E) and (J). In doing so, the Administrator will have to reckon with the interstate impact of LILCO's use of high sulfur oil. The statutory time period for examination of the New York proposals has not yet passed, however, and this Court cannot now order the EPA to assess the revisions or take other action.

12. EPA argues additionally that this count of the complaint should be dismissed for the plaintiffs' failure to exhaust the administrative remedy available in § 7426(b). That section permits a state or political subdivision to petition EPA for a finding that a major stationary source emits pollutants that interfere with air quality control in the petitioning state. It is clear that the petition procedure is not a prerequisite to institution of this civil suit. By its express terms, § 7426 applies only to "any state or political subdivision," and would not bar a claim by the non-municipal plaintiffs.

Moreover, this new provision was apparently designed as an independent basis for administrative review and control of interstate pollution, and not as an administrative hurdle to overcome in gaining access to the courts. This provision originated in the House Bill, H.R. 6161, § 309 (1977), which was accompanied by the following expression of intent in its legislative history:

This petition process is intended to expedite, not delay, resolution of interstate pollution conflicts. Thus, it should not be viewed as an administrative remedy which must be exhausted prior to bringing suit under section 304 (42 U.S.C. § 7604) of the act. Rather, the committee intends to create a second and entirely alternative method and basis for preventing and abating interstate pollution.

■ Consequently, this aspect of plaintiffs' claim is also premature.[12]

### 4. Promulgation of Photochemical Oxidant Control Measures

In Count V of the complaint, plaintiffs charge EPA with violation of a non-discretionary duty to promulgate federal regulations to control the transport to Connecticut of photochemical oxidants generated in New York. Plaintiffs assert that this duty arises under the "purposes and directives" of the Clean Air Act, the National Environmental Policy Act (42 U.S.C. §§ 4331 and 4332), the Fifth Amendment, and the federal common law of nuisance.

■ EPA has no mandatory duty under the Act to issue the regulations that plaintiffs seek. The legislative history of the 1977 Amendments is replete with indications that Congress acknowledged the severity of oxidant nonattainment problems and of the oxidant transport phenomenon.[13]

H.R.Rep.No.95–294, 95th Cong., 1st Sess. 331 (May 12, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News p. 1410.

13. In discussing proposed nonattainment plan provisions, the House Report on H.R. 6161 quoted a letter from EPA Administrator Train to Senator Edmund Muskie, dated May 12, 1975, which stated:

For oxidants, 74 air quality control regions have reported levels in excess of the national ambient air quality standards; it is expected that a higher proportion of these air quality control regions will continue to have oxidant levels exceeding national ambient air quality standards past the attainment dates.

H.R.Rep.No.95–294, 95th Cong., 1st Sess. 207 (May 12, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1286–87.

In another example, the Senate's amendments to the House bill created, at § 8 of S. 252, the Administrator's responsibility to publish guidelines for basic transportation control planning, currently imposed in § 7408(f)(1) of the Act. The Senate Committee recognized the necessity of information documents to assist the states in treating oxidant transport:

The phenomenon of hydrocarbon and oxidant atmospheric transport is becoming a subject of increasing interest because it implies that the present generation of metropolitan area strategies for oxidant control may have to be supplemented by hydrocarbon emission limi-

But, the Act on its face, and the committee reports describing the statutory scheme, clearly vest primary authority in the states to deal with these problems, under guidance from EPA.

Section 7502(a)(2) allows an extension to states with serious photochemical oxidant and carbon monoxide attainment difficulties, from the normal attainment deadline of December 31, 1982, until December 31, 1987, at the latest. Initial SIP revisions, due on January 1, 1979, must assure that the emission levels for these pollutants will be reduced by reasonably available technology in the interim. § 7502(b). While final enforcement measures need not be promulgated by the states before July 1, 1982, the states are required to undertake regional planning to "determine which elements of a revised implementation plan will be planned for and implemented or enforced by the State and which . . . by local governments or regional agencies, or any combination of local governments, regional agencies, or the State." §§ 7502(c), 7504.

These provisions preserve and reemphasize the policy of state control of pollutant sources, a policy originating in the 1970 Act. They embody the traditional "carrot and stick" philosophy by creating incentives for effective state and local planning to protect public health while still permitting industrial and commercial growth. The Senate Report expressed the belief that "States and communities, given additional time and flexibility, would be more willing to take the difficult steps necessary both to reduce the emission output from direct sources of pollution and to adopt the kinds of transportation and land use control necessary to reduce the causes of pollution." S.Rep.No. 95–127, 95th Cong., 1st Sess. 3 (May 10, 1977).

Therefore, a state whose 1979 plan revisions demonstrate that oxidant or carbon monoxide standards will not be met by 1982 may adopt a compliance schedule that is "more closely related to the performance of the auto industry with respect to the statutory standards." *Id.* This would allow a state to "choose whatever mix of continuous emission reduction measures and strategies it wants to meet the requirements of this section." H.R.Rep.No.95–294, 95th Cong., 1st Sess. 213 (May 12, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 1292. In return, the 1979 revisions must require alternative site analyses for major emitting facilities that propose to locate in a nonattainment area, establish a schedule for implementing a vehicle inspection and maintenance program, and require that funds reasonably available to state or local governments be used to improve public transportation. H.R.Rep.No.95–294, *supra,* at 157, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1537–38. Moreover, if the 1987 extension is granted, the mandate in § 7504 for a metropolitan planning organization guarantees the local involvement that had been previously lacking in the process of developing and enforcing transportation control plans. "This requirement recognizes that transportation control planning is a local political process affecting the daily lives and transportation patterns of local communities." S.Rep.No.95–127, *supra,* at 38.

EPA could not promulgate regulations at this time to control oxidant emission and transport within the tri-state area without undermining this statutory scheme. As previously discussed, EPA will not be in a position to issue oxidant regulations for New York and New Jersey until it has evaluated their 1979 SIP revisions and determined whether the states qualify for the oxidant attainment deadline extension, and only then if the proposed SIPs are found inadequate and the states fail to submit

tations applied uniformly across multistate regions.
Accordingly, the committee expects that EPA will evaluate the technical basis of oxidant transport and its policy implications, assist the States in initiatives to deal with the prob-

lem, and will utilize, where appropriate, the services and guidance of the National Air Quality Commission established elsewhere in this bill.
S.Rep.No.95–127, 95th Cong., 1st Sess. 24 (May 10, 1977).

satisfactory corrections. See §§ 7410(a)(2)(H) and (c).[14]

■ Plaintiffs also fail to state a colorable claim under the Fifth Amendment, NEPA, and the federal common law of nuisance. Plaintiffs allege no specific theory by which EPA has denied them due process of law or equal protection of the laws, and none is apparent. Congress' general declaration of a national environmental policy in 42 U.S.C. §§ 4331 and 4332 does not create an enforceable duty for the EPA to act in a manner inconsistent with the express terms of its enabling statute. Finally, any non-discretionary duty of the EPA to act in its regulatory capacity arises from the Clean Air Act, and not from federal common law; therefore, no right of action derives from federal common law to enforce such a duty. *Cf. Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (federal statute governing issuance of subpoenas allegedly violated; no common law cause of action for abuse of subpoena power implied from existence of the statute).

### 5. *Identity of Major Stationary Pollutant Sources in New Jersey*

Both plaintiffs and defendant seek summary judgment on Count VI, paragraph 80(e) of the Complaint, which charges EPA with a non-discretionary duty to revise the New Jersey SIP in compliance with § 7426(a)(2). This section provides that each applicable implementation plan must identify all major existing stationary sources that either would be subject to PSD measures in Part C of Title I, or may significantly contribute to interstate pollution, and that notice of such sources must be given to all nearby states no later than November 7, 1977.

Plaintiffs had originally alleged that New Jersey did not revise its plan pursuant to that provision, and therefore EPA had a mandatory duty under § 7410(c)(1)(A) to conform the New Jersey SIP. EPA responded that New Jersey had made its § 7426(a)(2) submission in a timely fashion, and attached a copy of the document as Appendix 7 to its Memorandum in Support of the Motion for Summary Judgment (filed October 30, 1978). Plaintiffs now argue that the submission is plainly inadequate to satisfy the requirements of § 7426.

The Administrator's duty to prepare and publish revisions to a SIP becomes obligatory under § 7410(c)(1)(A) when "the State fails to submit an implementation plan which meets the requirements of this section." In order for a plan or plan revision to fulfill the requirements of § 7410(a)(2)(E), it must "contain adequate provisions . . . (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement."

Any non-discretionary duty on EPA's part to promulgate a SIP for New Jersey, and thereby to notify Connecticut of the identity of major stationary pollutant sources in New Jersey that may have significant interstate impact, can arise only if New Jersey does not discharge its responsibilities under § 7426. These responsibilities, however, are not discharged merely by making a filing, but by proposing SIP revisions that implement the terms of that section and all applicable regulations. Thus, if the plaintiffs were able to substantiate their allegation of insufficiency, defendant may be bound to call for further revisions by New Jersey, or to promulgate a federal substitute for the inadequate submission.

14. Apparently, the statutory design for oxidant abatement is not, as plaintiffs allege, "at a standstill." Plaintiffs do not dispute the defendants' assertion that New York and New Jersey have submitted their 1979 nonattainment plan revisions. *See footnote 9.* Moreover, EPA alleges that it has issued specific guidelines to the states to assist them in carrying out Part D requirements, in fulfillment of the Agency's obligations under §§ 7408 and 7508. *See* 43 Fed.Reg. 21673 (May 19, 1978) (policy memorandum for nonattainment plan revisions); 44 Fed.Reg. 8311 (Feb. 9, 1979) (notice of availability of guidance materials); 44 Fed.Reg. 20372 (Apr. 4, 1979) (general preamble for approval or disapproval of Part D SIP revisions).

It is not for this Court to decide whether the New Jersey revision is sufficient under § 7426. Such a determination rests with the Administrator in approving or disapproving the revision under § 7410(a)(3)(A), see *Northern Ohio Lung Association v. EPA*, 572 F.2d 1143 (6th Cir. 1978), and a review of that decision is available only in the court of appeals. In replying to defendant's motion, plaintiffs assert that the EPA has not acted on the New Jersey proposal, in violation of its non-discretionary duty, and has therefore precluded them from initiating a § 7607 proceeding. Although plaintiffs may have a substantial claim, their complaint does not allege failure of EPA to act on the New Jersey submission, and EPA has had no opportunity to respond. The claim, as presented in subparagraph 80(e) of the Complaint is dismissed, with leave to amend within 20 days, and the cross-motions for summary judgment with respect to this subparagraph are dismissed as moot.

### 6. *Limitations on Awarding Federal Grants*

■ In their prayer for relief, plaintiffs seek to restrain EPA from awarding any federal grants to New York or New Jersey until the states have promulgated and enforced required SIP revisions. EPA's obligation to withhold federal assistance from states that are out of compliance with the requirements of the Act is circumscribed by § 7506. The conditions for denial of an award have not yet occurred, and any sanction by the EPA under that section is clearly not warranted. Therefore, prayer 10 of the Complaint is stricken.

Section 7506 provides:

(a) The Administrator shall not approve any projects or award any grants authorized by this chapter . . . in any air quality control region—

(1) in which any national primary ambient air quality standard has not been attained

(2) where transportation control measures are necessary for the attainment of such standard, and

(3) where the Administrator finds after July 1, 1979, that the Governor has not submitted an implementation plan which considers each of the elements required by section 7502 of this title (nonattainment plan provisions) or that reasonable efforts toward submitting such an implementation plan are not being made (or, after July 1, 1982, in the case of an implementation plan revision required under section 7502 of this title to be submitted before July 1, 1982).

(b) In any area in which the State . . . is not implementing any requirement of an approved or promulgated plan under section 7410 of this title, including any requirement for a revised implementation plan under this part, the Administrator shall not make any grants under this chapter.

Since both New York and New Jersey have submitted nonattainment plan revisions, the sanction under subsection (a) will not be available until July 1, 1979, at the earliest. If the states are permitted an extension for the attainment of photochemical oxidant or carbon monoxide air quality standards, enforcement of subsection (a) with respect to those pollutants is not appropriate until July 1, 1982. Obviously, plaintiffs' attempt to compel EPA's denial of federal grants under subsection (a) is premature.

Plaintiffs contend that subsection (b) authorizes the relief that they request. Subsection (b), however, expressly applies to states that fail to implement any provision of their SIPs, once any nonattainment revisions required under Part D have been submitted to EPA and approved by the Administrator. In essence, subsection (b) preserves the mandatory sanction set forth in subsection (a) after that subsection is no longer operative. Pertinent legislative history reinforces this construction of the statute. The initial Senate version of § 7506 withheld federal grants from states or local governments failing to implement provisions of a revised and approved plan, and the Conference Committee retained the

Senate's proposal. See S.Rep.No.95–127, 95th Cong., 1st Sess. 37 (May 10, 1977), and H.Conf.Rep.No.95–564, 95th Cong., 1st Sess. 156–57 (Aug. 3, 1977), *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1537–38. Since New York's and New Jersey's 1979 Part D revisions have not yet been approved by the Administrator; subsection (b) cannot presently be enforced.

### The Suit Against LILCO

LILCO, the sole private defendant in this action, is charged only in Count III of the Complaint. Count III alleges that LILCO maintains a federal common law nuisance by burning oil containing 2.8% sulfur at its Long Island electricity generating plants. The New York SIP allegedly provides a general 1% sulfur content limitation for that area, whereas Connecticut maintains a state-wide limitation of 0.5%.

**15.** Plaintiffs also invoke this Court's jurisdiction under 28 U.S.C. §§ 1332, 1343, 2201, and 2202. As there is complete diversity of citizenship between the plaintiffs and the New York corporate defendant and the amount in controversy exceeds the statutory minimum, § 1332 clearly exists as an alternative basis for jurisdiction.

**16.** It is well established that federal common law, when it exists, is among the "laws of the United States" within the purview of 28 U.S.C. § 1331(a), and thus there is federal question jurisdiction for claims based on federal common law. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).

Defendant contends that this Court must dismiss for lack of subject matter jurisdiction because the federal common law of nuisance has been preempted in its entirety by the Clean Air Act. Yet, even if the common law were preempted, federal question jurisdiction to consider the common law claim and the preemption defense is not defeated by the possibility that plaintiffs may not be entitled to relief. *See Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

**17.** Defendant raises significant due process challenges to maintenance of the action in this Court. LILCO argues, first, that it is not subject to *in personam* jurisdiction here because it does not transact business in Connecticut, and because the interstate transport of pollutants alone will not supply constitutionally required minimum purposeful contacts. *But see Byram River v. Village of Port Chester*, 7 E.R.C. 1127 (D.Conn.1974).

Second, LILCO contends that service of process cannot properly be made upon it under the

LILCO moves to dismiss on numerous grounds, including lack of subject matter jurisdiction, lack of *in personam* jurisdiction, improper venue, insufficiency of service, and failure to state a claim. Without considering all of the alleged bases for subject matter jurisdiction,[15] it is sufficient to observe that this Court's jurisdiction is properly predicated on 28 U.S.C. § 1331(a) to consider the federal common law claim.[16] Although the defenses of lack of *in personam* jurisdiction, improper venue, and insufficiency of process relate to the propriety of maintaining this action in the District Court of Connecticut,[17] this Court's disposition makes an examination of these contentions unnecessary. Assuming that plaintiffs have standing to assert a claim of federal common law nuisance,[18] they have failed to

sole provision of the Connecticut long-arm statute arguably applicable to this case, subsection (4) of Conn.Gen.Stat.Ann. § 33–411(c) (West 1979 Supp.), since Connecticut allegedly suffers only the harmful effects of tortious conduct committed in New York, and not injury resulting from tortious conduct committed within Connecticut.

Finally, LILCO alleges that the proper venue for this nuisance action is the Eastern District of New York, where the polluting sources, the physical evidence of emissions, and the concerned witnesses are located. *But see Township of Long Beach v. City of New York*, 445 F.Supp. 1203 (D.N.J.1978) (venue where effects of pollution felt and injury occurred).

**18.** Defendant alleges that plaintiffs cannot properly bring this action against it because private citizens and municipalities have no standing to assert a claim of federal common law nuisance. LILCO reasons that the federal common law of nuisance evolved as a basis for dealing with the environmental rights of a state against impairment by sources outside its domain. Consequently, the argument continues, only a state has standing to redress an alleged infringement of the federal common law nuisance. *See Committee for Jones Fall Sewage System v. Train*, 375 F.Supp. 1148 (D.Md.1974), *aff'd*, 539 F.2d 1006 (4th Cir. 1976); *Parsell v. Shell Oil Co.*, 421 F.Supp. 1275 (D.Conn.1976), *aff'd*, 573 F.2d 1289 (2d Cir. 1977). It may not be essential for the state to be a formal party to a federal common law nuisance action, however, where the interests of the state are sufficiently implicated in a dispute of clearly interstate nature. *See Township of Long Beach v. City of New York*, 445 F.Supp. 1203, 1213–14

state a claim upon which relief can be granted.

The federal common law of nuisance developed to guarantee to the states a right of protection against impairment of their environmental resources by outside polluters. The Courts created federal common law where they perceived a definite federal interest that was inadequately protected by existing federal legislation. See *Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Texas v. Pankey*, 441 F.2d 236, 240 (10th Cir. 1971). Only a federal common law basis could provide an adequate means of dealing with interstate environmental disputes, at least "[u]ntil the field has been made the subject of comprehensive legislation or authorized administrative standards." *Texas v. Pankey, supra*, 441 F.2d at 241. See also *Illinois v. City of Milwaukee, supra*, 406 U.S. at 107, 92 S.Ct. 1385.

The defendant contends that the Clean Air Act and EPA's substantive rulings have entirely preempted the federal common law of nuisance. Although several courts have found that the application of federal common law in the context of interstate water pollution is not inconsistent with the purposes and operation of federal legislation,[19] no case has yet determined whether the federal common law regarding air quality has been preempted in whole or in part by the Act and promulgated regulations. This Court need not reach the issue of preemption, however. Even if some common law of nuisance survives, plaintiffs are not entitled to equitable relief under these circumstances.

The parties do not dispute that LILCO's conduct was authorized by a variance to the New York SIP that was approved by the EPA on August 26, 1977.[20] Complaint ¶ 77. In approving the special limitation, the EPA was required to determine that LILCO's use of 2.8% sulfur oil would not unduly interfere with Connecticut's pollution control measures. §§ 7410(a)(3)(A) and (a)(2)(E). This Court will not devise an equitable remedy to proscribe the very conduct that the EPA, acting in its regulatory capacity pursuant to statutory mandate, has specifically legitimated.[21] While it is conceivable that the

(D.N.J.1978) (municipalities held to have standing to bring federal common law nuisance action for water pollution).

**19.** See *United States v. Ira S. Bushey & Sons, Inc.*, 363 F.Supp. 110, 120 (D.Vt.), aff'd, 487 F.2d 1393 (2d Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1973); *Illinois ex rel. Scott v. City of Milwaukee*, 366 F.Supp. 298, 301 (N.D.Ill.1973); *Township of Long Beach v. City of New York*, 445 F.Supp. 1203, 1214 (D.N.J.1978).

The similarity of the Clean Air Act and the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., (Supp.1976), ·have led courts to refer to the provisions of one in interpreting its counterpart in the other. See *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 389, 541 F.2d 1, 17 (1976) (en banc); *Natural Resources Defense Council, Inc.. v. Train*, 166 U.S.App.D.C. 312, 321–22, 510 F.2d 692, 701–02 (D.C.Cir. 1975).

**20.** EPA solicited public comments on the proposed variance in 42 Fed.Reg. 21113 (1977). The State of Connecticut submitted its views, which were published in 42 Fed.Reg. 43078079 (1977). EPA considered the comments, found no threat to Connecticut's attainment of applicable air quality standards, and approved the special limitation at 42 Fed.Reg. 43079 (1977).

**21.** The relief sought by plaintiffs' action would have a substantial impact upon the implementation of a specific agency determination. Plaintiffs' claim against LILCO's conduct as a federal common law nuisance is, in effect, an attack upon the validity of the EPA-approved variance. It is mere sophistry to argue that a challenge to LILCO's operation in compliance with the special limitation is not a challenge to the legality of the limitation itself. The expansion of the common law of nuisance to accommodate plaintiffs' action would, however, undercut the explicit statutory scheme of judicial review. Congress intended that the courts of appeals consider all claims against the validity of performance standards approved by final decision of the Administrator. See *Oljato Chapter of Navajo Tribe v. Train*, 169 U.S.App. D.C. 195, 199–202, 515 F.2d 654, 658–61 (D.C. Cir. 1975) (litigation seeking revision of stationary source pollutant standard must be brought as a direct appeal under § 7607). "Congress, of course, is the primary source of federal law, · and the federal courts must adhere to the intent of Congress whenever this intent is discernible." *United States v. Carson*, 372 F.2d 429, 432 (6th Cir. 1967).

Additionally, the interstate pollution abatement procedure prescribed in § 7426 operates

Connecticut state courts may apply state nuisance law more rigidly,[22] this Court will not "turn to a supposed body of federal common law to impose stricter standards than the statute provides." *Committee for Jones Falls Sewage System v. Train*, 539 F.2d 1006, 1009 (4th Cir. 1976).[23]

In summary, all claims of the complaint are dismissed for failure to state a claim on which relief can now be granted. This dismissal is without prejudice to the filing of an amended complaint within 20 days, failing which the action will be dismissed. To some extent this ruling has considered uncontested matters beyond the scope of the pleadings and therefore could be considered a ruling for summary judgment, Fed.R. Civ.P. 12(c), but since the plaintiffs are being given leave to amend, the Court's ruling is being made with respect to the sufficiency of the complaint.

---

so that, on the basis of new information available which may require a repeal or modification of any promulgated standard, a state or "political subdivision" may challenge the activity of any stationary source functioning in accordance with that standard. The municipal plaintiffs may petition the Administrator for a finding that LILCO's variance interferes with Connecticut's pollution control measures in violation of § 7410(a)(2)(E)(i), and any adverse decision may be reviewed in the appropriate court of appeals under § 7607(b).

Plaintiffs allege a nuisance in the increased levels of sulfur dioxide, particulate matter, and sulfates transported into Connecticut as a result of the burning of 2.8% sulfur oil. Although EPA has promulgated national air quality standards for sulfur dioxide and particulates, Complaint ¶ 45, it appears that no such standards have been promulgated for sulfates, Complaint ¶ 41. The absence of sulfate standards will not prevent a § 7426 review of the interstate transport effects of that pollutant, however. The petition procedure in § 7426 derived from the Senate bill, S. 252, 95th Cong., 1st Sess. § 8 (1977), which was expressly not restricted to substances currently regulated by the EPA. *See* S.Rep.No.95–127, 95th Cong., 1st Sess. 42 (1977).

This petition procedure was designed "to equalize the positions of the States with respect to interstate pollution by making a source at least as responsible for polluting another State as it would be for polluting its own State." S.Rep.No.95–127, 95th Cong., 1st Sess. 42 (1977). Thus, § 7426 aims to rectify the very economic and competitive disadvantages imposed by interstate pollution upon states with more stringent control requirements of which plaintiffs complain. Complaint ¶ 79. Since the ultimate purpose of any equitable relief against LILCO is to vitiate the effect of the special limitation, this Court will not create a common law remedy to accomplish that

which a successful § 7426 petition would achieve.

22. Section 7604(e) of the Act expressly preserves unrestricted "any right which any person (or class of persons) may have under any statute or common law . . . to seek any other relief . . . ." The identical provision in the Federal Water Pollution Control Act has been construed to give "continuing validity" to state common law nuisance actions. *Committee for Jones Falls Sewage System v. Train*, 539 F.2d 1006, 1009 n. 9 (4th Cir. 1976). Assuming that jurisdiction may properly be exercised over LILCO, the Connecticut state courts may choose to fashion the relief that plaintiffs seek here, provided they find that the Administrator's actions have not specifically preempted any common law right that plaintiffs may claim under state law.

23. *Jones Fall Sewage System* held that, in the context of a strictly intrastate controversy, a federal common law remedy was not available to obtain judicial relief from discharges that the Federal Water Pollution Control Act and the EPA had permitted. The case appears to have turned in large part on the Court's view that the doctrine of *Illinois v. City of Milwaukee, supra*, applies exclusively to interstate disputes in which the rights of a state are sought to be vindicated. 539 F.2d at 1010. Plaintiffs attempt to distinguish *Jones Falls Sewage System* because such a claim of interstate dimension is involved here. Nevertheless, this Court subscribes to the observation of the Fourth Circuit, as equally appropriate to the factual situation at bar, that "it would be an anomaly to hold that there was a body of federal common law which proscribes conduct which the . . . Act of Congress legitimates." 539 F.2d at 1009.